**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| ERNEST CUMMINGS,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 3:25-CV-02090-JRK<br><br>DISTRICT JUDGE JAMES R. KNEPP, II<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Ernest Cummings seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **VACATED** and **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation. On remand, the ALJ should clearly articulate the rationale supporting her residual functional capacity and past relevant work findings, ensure those findings are supported by substantial evidence, and ensure her stated rationale builds an accurate and logical bridge between the evidence and the result.

## I. Procedural History

Mr. Cummings filed his DIB and SSI applications on June 16, 2023, alleging disability beginning July 1, 2022. (Tr. 58, 67.) He alleged disability due to possible headaches, possible

vertigo, severe headaches, and severe vertigo. (Tr. 59, 68.) His application was denied at the initial level (Tr. 58, 67) and upon reconsideration (Tr. 76-77), and he requested a hearing (Tr. 116, 140). On October 9, 2024, a telephonic hearing was held before an Administrative Law Judge ("ALJ"). (Tr. 36-57.) The ALJ issued an unfavorable decision on December 2, 2024, finding Mr. Cummings had not been under a disability from July 1, 2022, through the date of the decision. (Tr. 14-29.) Mr. Cummings requested review of the decision by the Appeals Council, which denied his request for review on August 4, 2025, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6.)

Mr. Cummings filed the instant Complaint on October 1, 2025 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 7, 8, 9). He raises the following assignments of error:

1) The RFC is not supported by substantial evidence because the ALJ rejected the only functional medical opinions and substituted her own interpretation of the medical evidence to find a medium RFC and eliminate driving restrictions.

2) The ALJ erred at Step Four by finding that Plaintiff's prior work qualified as past relevant work.

(ECF Doc. 7, p. 1.)

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Mr. Cummings was born in 1965 and was 57 years old on the alleged disability onset date, making him an individual of advanced age under Social Security regulations. (Tr. 59, 68.) He had at least a high school education. (Tr. 287.) Mr. Cummings has not worked since July 1, 2022, the alleged onset date. (Tr. 59, 68.)

## B. Medical Evidence

### 1. Relevant Treatment History[1]

Mr. Cummings was involved in a motor vehicle accident ("MVA") in December 2020 and has reported experiencing "constant headaches" ever since. (*See, e.g.,* Tr. 364, 607.) An October 26, 2021 MRI of the cervical spine showed degenerative changes in the cervical spine leading to severe left neural foramina narrowing at C3-C4, moderate left neural foramina narrowing at C4-C5, moderate spinal canal stenosis and severe left neural foramina narrowing at C5-C6, moderate canal stenosis and severe bilateral neural foraminal narrowing at C6-C7, and mild to moderate bilateral neural foramina narrowing at C7-T1, right worse than left. (Tr. 385-86.) On November 10, 2021, reviewing neurologist Ajaz A. Sheikh, M.D., noted that the MRI showed multilevel arthritic changes "leading to pinching of nerves as they come out of the spinal cord into the neck," but with "no significant pressure on spinal cord." (Tr. 418.) Dr. Sheikh doubted surgery was required and recommended that Mr. Cummings see a spine specialist for possible steroid injections. (*Id.*)

On December 8, 2021, Mr. Cummings followed up with Brandon C. Gabel, M.D., at ProMedica Neuroscience Center Physicians, reporting constant bitemporal headaches and balance issues when standing for more than a few minutes since the December 2020 MVA. (Tr. 415.) On examination, he was in no acute distress, he had 5/5 strength throughout the upper and lower extremities, he exhibited diminished reflexes in the upper and lower extremities, sensation was intact to light touch, and there was no tenderness to palpation of the paraspinal musculature. (Tr. 416.) Dr. Gabel reviewed the recent MRI and an x-ray of the cervical spine taken that day. (Tr. 416-17.) The x-ray showed slight anterolisthesis on flexion at C4-C5 and multilevel facet

[1] The Court's summary of the medical evidence is not exhaustive and is generally limited to evidence cited by the parties that is relevant to the legal and factual issues before the Court.

arthropathy and degenerative disc disease at C5-C6 and C6-C7. (Tr. 439.) On examination, Dr. Gabel observed no neurological findings or evidence of myelopathy or radiculopathy and opined that Mr. Cummings's headaches did not stem from cervical spondylosis. (Tr. 417.) He ordered a screening MRI and instructed Mr. Cummings to follow up with his neurology team. (*Id.*)

On March 1, 2022, Mr. Cummings presented to Dr. Sheikh to follow up on his ongoing headache and sleep issues. (Tr. 376-81.) He reported improved sleep using a CPAP machine, but constant, bilateral, frontotemporal, throbbing headache that was 4-6/10 and not associated with vision changes, photophobia, phonophobia, neck pain, or nausea/vomiting. (Tr. 376-377.) He also endorsed daytime sleepiness, fatigue, and difficulty concentrating. (Tr. 379.) His neurological and physical examination was normal. (Tr. 380.) Dr. Sheikh diagnosed obstructive sleep apnea and persistent daily headache, administered a Toradol injection, continued melatonin, prescribed a trial of amitriptyline, and set a follow up in six months. (Tr. 381.)

On July 2, 2022, Mr. Cummings was in a second MVA, during which his head snapped back and hit on the head rest. (Tr. 403.) After the accident, he experienced disorientation when standing for more than 20 minutes. (*Id.*)

On July 6, 2022, Mr. Cummings presented to Matthew Bertollini, DC, at Glass City Spine and Rehab for an initial examination. (Tr. 493-95.) He reported constant headaches that were 8/10 and neck pain that was 3/10. (Tr. 493.) On physical examination, he exhibited: spinal asymmetry/fixation at OCC, C1, C4, C5, C6, and C7; spasm/hypertonicity and moderate tenderness in the cervical spine; reduced cervical range of motion; normal reflexes throughout; and positive cervical distraction, foraminal compression, and spinal percussions tests. (Tr. 493-94.) DC Bertollini diagnosed sprain of cervical spine ligaments, cervicalgia, other muscle

spasms, and acute post-traumatic headache, not intractable and recommended chiropractic treatment three times a week for four to five weeks. (Tr. 494-95.)

Mr. Cummings underwent chiropractic treatment from July 6 through November 28, 2022. (Tr. 493-595.) Physical examination findings remained generally unchanged from the initial examination. (*See e.g.,* Tr. 496, 506, 516, 524, 532, 536, 542, 550, 556, 564, 574, 578, 588, 594.) Treatment notes indicated slight improvement over the course of care, but Mr. Cummings consistently reported neck pain and persistent, moderate to severe headaches that were constant and not relieved by modifications to activities of daily living ("ADLs"). (*See, e.g.,* Tr. 496, 502, 506, 514, 558, 562, 570, 574, 578, 588, 594.) At a few appointments, he reported a very severe headache accompanied by dizziness, feeling off balance, or blurred vision and/or was visibly swaying at his appointment. (*See* Tr. 508 (7/28/2022), 516 (8/8/2022), 538 (9/6/2022), 550 (9/19/2022).) He was discharged from chiropractic care on November 28, 2022, with a referral to neurology for unresolved headaches, and he reported that his range of motion was "much better," and he was happy with his care. (Tr. 595.)

On August 26, 2022, Mr. Cummings presented to Chayanika Pal, M.D., at Fallen Timbers Primary Care Clinic to address chronic headaches and high blood pressure. (Tr. 605-08.) He reported his July MVA and said he was following with a neurologist for chronic headaches. (Tr. 607.) Dr. Pal did not conduct a physical examination and assessed chronic daily headache, whiplash injury to the neck, and obstructive sleep apnea. (*Id.*)

On September 1, 2022, Mr. Cummings attended an appointment with Dr. Sheikh. (Tr. 370-375 (dup. at 398-403).) He reported that amitriptyline was not significantly improving his headaches. (Tr. 370.) His physical examination showed no tenderness of the occipital condyles or nerves, no midline c-spine tenderness, intact cranial nerves, full orientation, 5/5 strength in the

upper extremities, full reflexes, and normal coordination, sensation, and gait. (Tr. 374.) Dr. Sheikh continued amitriptyline 50 mg daily and set a follow-up in six months. (Tr. 375.)

On December 8, 2022, Mr. Cummings followed up with Dr. Pal after being seen at the emergency room ("ER") on December 1 for vertigo. (Tr. 600.) His symptoms had improved at the ER with Zofran and Valium but had later returned. (*Id.*) He reported fatigue and dizzy spells when standing for more than 15 minutes since his July 2022 MVA. (*Id.*) On physical examination, he was alert and fully oriented, but his coordination and gait were abnormal, and he was observed to be swaying in his chair. (*Id.*) Dr. Pal reviewed a December 1, 2022 CT of the head and brain, which showed atherosclerotic changes with mild right internal carotid narrowing, no acute vascular abnormality in the cervical region, no acute intracranial abnormality, and no evidence of large territorial ischemia. (Tr. 601.) She diagnosed ataxia following head trauma, contacted Mr. Cummings's neurologist, and referred Mr. Cummings to the ER immediately. (*Id.*; *see* Tr. 396-97 (documenting call to neurologist, who also advised that Mr. Cummings go to the ER).) It is not evident from the record whether Mr. Cummings went to the ER at that time.

On June 1, 2023, Mr. Cummings returned to see Dr. Sheikh at ProMedica Neurology. (Tr. 363-67.) He reported constant bitemporal pain with occipital throbbing, ranging from 4/10 to 7/10 on average and up to 9/10 at worst, sometimes accompanied by blurry vision and vertigo. (Tr. 363.) He was treating only with over-the-counter ibuprofen; he had stopped taking amitriptyline on his own and never filled a prescription for gabapentin from his primary care physician. (*Id.*) He also reported fatigue, low energy, and poor concentration. (Tr. 366.) On physical examination, he had no tenderness over the occipital condyles or nerves, no midline c-spine tenderness, full orientation, intact cranial nerves, full strength, and normal reflexes, coordination, sensation, and gait. (Tr. 367.) Dr. Sheikh diagnosed persistent daily headache,

obstructive sleep apnea, and sleep-onset insomnia. (Tr. 367-68.) He gave instructions on sleep hygiene and prescribed gabapentin for headaches. (*Id.*)

On June 10, 2024, Mr. Cummings followed up with Dr. Sheikh. (Tr. 597-99.) The actual treatment note does not appear in the records, merely a letter from Dr. Sheikh to Dr. Pal, describing his findings from the visit. (*Id.*) Mr. Cummings had stopped taking gabapentin and was only taking ibuprofen over the counter to treat headaches. (Tr. 598.) Dr. Sheikh diagnosed chronic daily headache, obstructive sleep apnea, sleep-onset insomnia, vertigo, and depression. (*Id.*) He encouraged use of a CPAP machine and good sleep hygiene, prescribed amitriptyline again, and referred Mr. Cummings to psychiatry and a headache clinic. (*Id.*)

**2. Opinion Evidence**

On September 19, 2023, Bruce Hallmann, M.D., conducted a physical Residual Functional Capacity ("RFC") assessment of Mr. Cummings. (Tr. 63-65, 72-74.) He opined that Mr. Cummings could: occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand or walk six hours and sit for six hours in an eight-hour workday; never crawl or climb ladders, ropes, or scaffolds; and frequently balance, stoop, kneel, crouch, and climb ramps or stairs. (Tr. 63-64, 72-73.) He further opined that Mr. Cummings should avoid all exposure to unprotected heights, commercial driving, or work involving hazardous machinery. (Tr. 64, 73.)

On December 28, 2023, on reconsideration, J.V. Corcoran, M.D., affirmed Dr. Hallmann's findings. (Tr. 80-82, 86-88.)

**C. Hearing Testimony**

At the hearing on October 9, 2024, Mr. Cummings testified in response to questions from the ALJ and his attorney. (Tr. 40-52.) A Vocational Expert ("VE") also testified. (Tr. 52-55.)

The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, plus a limitation of no commercial driving, could not perform Mr. Cummings's prior work, but could perform representative positions in the national economy, including day worker, battery loader, and crate liner. (Tr. 53-54.) If the exertional level were reduced to light and the commercial driver limitation removed, Plaintiff's past work would be available as actually performed but not as generally performed. (Tr. 54.)

## III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.
2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed

impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520[2]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy. *Id.*

## IV. Law & Analysis

### A. Standard of Review

A court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)) (alteration in original). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge

between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

### A. First Assignment of Error: The ALJ Lacked the Support of Substantial Evidence and Failed to Build a Logical Bridge When She Adopted a Medium RFC

In his first assignment of error, Mr. Cummings argues that the RFC lacked the support of substantial evidence because the ALJ "rejected the only functional medical opinions" in evidence—those of state agency medical consultants, Drs. Hallmann and Corcoran—and "substituted her own interpretation of the medical evidence to find a medium RFC and eliminate driving restrictions." (ECF Doc. 7, p. 8.) While the state agency consultants opined that Mr. Cummings could perform light work with no commercial driving (Tr. 63-64, 72-73, 80-82, 86-88), the ALJ found the opinions "only partially persuasive" (Tr. 25-26) and adopted a medium RFC with no commercial driving limitations (*id.*, Tr. 23). In challenging this RFC, Mr. Cummings clarifies he is not asserting that ALJs "must adopt any particular opinion"; instead, he argues when "an ALJ departs from the only medical-source functional assessments, the resulting RFC still must be supported by substantial evidence that connects the medical evidence to the specific functional limitations the ALJ adopts."[3] (ECF Doc. 7, p. 8.) The Commissioner argues in response that the ALJ was not required to base the RFC on a medical opinion and acted within her authority when she drew conclusions based on the medical evidence. (ECF Doc. 8, pp. 6-7.)

---

[3] Mr. Cummings frames many of his arguments in the context of a standard articulated in *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008). (ECF Doc. 7, pp. 8-11.) But *Deskin* is not binding authority and numerous judges in this district have criticized and declined to follow the standard. *See, e.g., Carr v. Comm'r of Soc. Sec.*, No. 5:23-CV-00187, 2024 WL 1343473, at *5 (N.D. Ohio Mar. 30, 2024) ("District courts in this circuit have declined to follow *Deskin* and *Kizys*. . . . So, too, does this Court.") (citations omitted); *Winans v. Comm'r of Soc. Sec.*, No. 5:22-cv-01793, 2023 WL 7622634, at *4 (N.D. Ohio Nov. 15, 2023) (describing *Deskin* as "a non-binding district court decision that conflicts with the regulations and Sixth Circuit case law" and "places a higher burden on the ALJ than the Sixth Circuit does"); *Davidson v. Comm'r of Soc. Sec.*, No. 3:22 CV 938, 2023 WL 5948122, at *4 (N.D. Ohio Sept. 13, 2023) (noting that *Deskin* is not binding and that "[t]his Court itself has recently determined reliance on 'stale' non-examining state agency opinions does not require remand") (citing *Van Pelt v. Comm'r of Soc. Sec.*, No. 1:19 CV 2844, 2020 WL 7769729, at *9-11 (N.D. Ohio Dec. 30, 2020)). The undersigned concludes that this case is more appropriately decided under the applicable Social Security regulations and Sixth Circuit authority.

**1. Framework for Assessing the RFC and Medical Opinion Evidence**

A claimant's RFC "is the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must assess the "residual functional capacity based on all the relevant evidence in [the] case record," *id.*, such as: medical history; medical signs and laboratory findings; effects of treatment; reports of daily activities; lay evidence; recorded observations; medical source statements; symptoms; evidence from attempts to work; need for a structured living environment; and work evaluations, *see* Social Security Ruling ("SSR") 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34477 (July 2, 1996).

"The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician," *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)). Accordingly, an ALJ is "not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Id.* Even where an opinion was given great weight under prior regulation, the Sixth Circuit held "there [was] no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). But where an ALJ's RFC assessment "conflicts with an opinion from a medical source," he "must explain why the opinion was not adopted." SSR 96–8p, 61 Fed. Reg. at 34478; *see Fleischer*, 774 F. Supp. 2d at 881.

Under applicable regulations, ALJs need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a); *see Sallaz v. Comm'r of Soc. Sec.*, No. 23-3825, 2024 WL 2955645, at *5 (6th Cir. June 12, 2024) (quoting 20 C.F.R. § 404.1520c(a)). However, they must evaluate the "persuasiveness" of

medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation. 20 C.F.R. § 404.1520c. Those five factors include supportability, consistency, relationship with the claimant, specialization, and other factors; but the most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2), 404.1520c(c)(1)-(5). ALJs must therefore explain how they considered consistency and supportability but need not explain how they considered other factors. 20 C.F.R. § 404.1520c(b)(2).

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence. *See* 20 C.F.R. § 416.920c (governing how ALJs consider and articulate findings re: medical opinions); 20 C.F.R. § 416.920(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

**2. The ALJ Erred When She Adopted a Medium RFC Without Adequately Explaining Why She Rejected the State Agency Opinions' Light RFC**

The ALJ analyzed the persuasiveness of the state agency opinions as follows:

> The initial State agency medical consultant, Bruce Hallmann, M.D., found that the claimant could perform light exertional work with frequent climbing of ramps and stairs, balancing, stooping, kneeling, and crouching, no climbing of ladders, ropes, or scaffolds or crawling, and no exposure to unprotected heights, commercial driving, or work involving hazardous machinery (Exs. 2A; 4A). The reconsideration State agency medical consultant, J.V. Corcoran, M.D., concurred with Dr. Hallmann's assessment as no new medical evidence was submitted or obtained at the reconsideration level (Exs. 7A-8A). I find their assessments only partially persuasive because they are somewhat supported and only partially consistent with the evidence of record. Regarding supportability, I note that they considered the claimant's limited treatment with his neurologist, objective findings on his cervical spine MRI, response to CPAP treatment for his OSA, and multiple physical examinations that showed no neurological deficits, a normal gait, and full strength throughout. However, Drs. Hallmann and Corcoran limited the claimant to no commercial driving, in part, due to his vertigo, but as detailed above such impairment is not supported by objective testing. Furthermore, the record contains no opinions or restrictions from his treating providers restricting him from commercial driving, and the claimant acknowledged at the hearing that he still

> drove and had a valid driver's license (Hearing Recording). As such, I do not find any limitations with respect to commercial driving are warranted by the record.
>
> Additionally, Drs. Hallmann and Corcoran did not provide any substantive justification for why the claimant was limited to light exertional work, as opposed to medium exertional work. Instead, in finding that the claimant could perform light exertional work, they cited to the claimant's cervical DDD and OSA. Despite this, they observed that the claimant's physical examinations were unremarkable, including normal gait, full strength, and no neurological deficits. Further supporting that the claimant is not limited to light exertional work because of his cervical DDD are 1) his neurologist's remarks regarding his cervical spine MRI, which indeed showed some severe changes but no significant pressure on the spinal cord (Ex. 2F, 32), 2) his own testimony that he does not really have pain, just stiffness (Hearing Recording), and 3) his limited treatment for his cervical DDD, which has been conservative and provided improvement in his range of motion. As detailed above, the claimant consistently reported that his OSA was well controlled with CPAP with no adjustments being made to his CPAP, which also would not justify a light residual functional capacity.
>
> While I disagree that the record supports limitations to light exertional work and no commercial driving as the State agency medical consultants found, I also find that their assessments are lacking in limitations to account for the claimant's persistent daily headache. Specifically, the claimant alleged experiencing brain fog and having some difficulties with concentrating (Hearing Recording), which could reasonably be expected with a persistent daily headache. Accounting for his consistent reports of a daily persistent headache in the record and allegations at the hearing, I find that the claimant can be exposed to no more than moderate noise levels as defined by the DOT, can carry out simple instructions that do not involve detailed or complex decision-making or judgment, and can tolerate occasional changes in a routine work setting. No greater limitations are supported considering the claimant has reported no known triggers for his headache, has reported no phonophobia, photophobia, nausea, or vomiting, and has had mental status findings on examinations that consistently show him as alert, oriented, with good attention and concentration, and with no cognitive deficits.

(Tr. 25-26 (emphasis added).)

In challenging the ALJ's RFC, Mr. Cummings argues the ALJ did not identify substantial evidence to "connect the medical evidence to the specific functional findings the ALJ adopt[ed]," specifically her rejection of limitations to light work and no commercial driving. (ECF Doc. 7, p. 8.) More specifically, he argues: (1) the evidence cited in rejecting the limitation to light work "did not suggest a medium capacity" (ECF Doc. 7, pp. 9-10); and (2) the ALJ's cited reasons for

rejecting a commercial driving restriction ignored evidence that connected Mr. Cummings's alleged vertigo symptoms to his severe headache disorder (*id.* at pp. 11-12).

Beginning with the first argument, the ALJ cited the following evidence to support her finding that the record did not support a limitation to light work: (1) unremarkable physical examination findings showing a normal gait, full strength, and no neurological deficits (Tr. 26); (2) a neurologist's remarks that Mr. Cummings's 2021 cervical MRI "showed some severe changes but no significant pressure on the spinal cord" (*id.* (citing Tr. 418)); (3) Mr. Cummings's testimony at his hearing that he did not really have pain, just stiffness (*id.*; *see* Tr. 50 ("But I don't have a whole lot of neck pain. It's stiffness.")); (4) Mr. Cummings's "limited treatment for his cervical DDD, which has been conservative and provided improvement in his range of motion" (*id.*); and (5) Mr. Cummings's consistent reports that his OSA was well controlled, with no adjustments needed to his CPAP (*id.*). The Commissioner argues this analysis was sufficient because "reviewing the medical evidence and drawing conclusions is precisely the role of the ALJ." (ECF Doc. 8, p. 7.) But Mr. Cummings argues that the ALJ exceeded her authority because the supporting evidence cited by the ALJ "did not suggest a medium exertional capacity," and therefore the ALJ's rejection of a limit to light work lacked "a logical and evidentiary bridge from the record to that conclusion." (ECF Doc. 7, p. 9; ECF Doc. 9, p. 3.)

To facilitate the Court's analysis, it is appropriate to consider the distinctions between light and medium exertional work. Under the regulations, "[l]ight work" requires "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). In contrast, "[m]edium work" requires "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). "Since frequent lifting or carrying requires being on one's feet up to two-

thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983-1991 Soc. Sec. Rep. Serv. 24, *5 (Jan 1, 1983). The same is true for the "full range of medium work." *Id.* Thus, the main difference between light and medium work is the weight one is expected to lift "at a time" and the weight one is expected to "frequently lift[] or carry[]." 20 C.F.R. §§ 404.1567(b), (c).

Here, the ALJ acknowledged that a 2021 cervical spine MRI "showed degenerative changes leading to mild to severe neural foramina narrowing at multiple levels" with "no significant pressure on the spinal cord" and that Mr. Cummings treated his cervical DDD with chiropractic adjustments and physical therapy, but noted that physical and neurological findings were normal during ongoing treatment and that he reported his OSA symptoms improved with the use of a CPAP. (Tr. 23-25.) The state agency consultants acknowledged similar evidence (*e.g.,* Tr. 62) but found a restriction to light work appropriate "[d]ue to cervical DDD with severe left foramina narrowing C3-4, persistent daily headache since MVA 12/26/20, [and] OSA with related fatigue (improved on CPAP)" (*e.g.*, Tr. 64). In her persuasiveness analysis, the ALJ found the state agency opinions lacked "any substantive justification for why the claimant was limited to light exertional work, as opposed to medium exertional work," given Mr. Cummings's unremarkable physical examination findings, the lack of MRI evidence showing "significant pressure on the spinal cord," his testimony that he suffered "stiffness" rather than neck pain, his conservative treatment with improved range of motion, and his controlled OSA. (Tr. 26.)

Mr. Cummings argues that the ALJ's reasoning lacks the support of substantial evidence because the evidence cited by the ALJ "did not suggest a medium exertional capacity" and "the ALJ's reasoning depends on a lay inference about what moderate spinal canal stenosis and severe foraminal narrowing imply for exertional capacity." (ECF Doc. 7, pp. 9-10.) The

undersigned finds the gap in the ALJ's reasoning may be stated more simply. As another judge in this district has explained, neither the records identified by the ALJ nor the ALJ's analysis of those records specifies how the records or findings "bear upon [Mr. Cummings]'s ability to lift fifty pounds occasionally and twenty five pounds frequently[.]" *Jones v. Comm'r of Soc. Sec.*, No. 1:17-CV-1497, 2018 WL 3036207, at *9 (N.D. Ohio June 19, 2018). In other words, "[m]issing from th[e] [ALJ's] analysis is any discussion of [Mr. Cummings]'s ability to lift things." *Id.* This is a critical failing where the distinction between medium and light work lies in the weight a worker is able to lift or carry. In the context of a cervical impairment with mild to severe neural foramina narrowing at multiple levels, it is not clear how a lack of significant pressure on the spinal cord, feelings of neck stiffness rather than pain, normal examination findings, or conservative treatment specifically undermine a medical opinion that Mr. Cummings is limited to frequently lifting and carrying up to 10 pounds, or how they support a finding that Mr. Cummings can instead lift or carry 25 pounds for up to six hours of the workday.

Considering the state agency consultants' opinions that Mr. Cummings's cervical DDD with "severe left foramina narrowing [at] C3-4," daily headaches, and OSA limit him to lifting or carrying up to ten pounds on a frequent basis during the workday (Tr. 64, 73), the undersigned finds the ALJ failed to "build an accurate and logical bridge between the evidence and the result" when she found Mr. Cummings capable of frequently lifting or carrying up to 25 pounds without explaining how the evidence she cited supported a significant increase in the ability to lift and carry. *Fleischer*, 774 F. Supp. 2d at 877. Without an adequate analysis to support the increased lifting and carrying capacity, the undersigned further finds that the ALJ's findings lacked the support of substantial evidence. *See, e.g., Jones*, 2018 WL 3036207, at *8-9 (citing cases).

Mr. Cummings also argues that the ALJ lacked substantial evidence to support her rejection of the state agency consultants' commercial driving restriction. (ECF Doc. 7, pp. 11-13; ECF Doc. 9, p. 3.) The undersigned concludes that this argument need not be addressed for two reasons. First, as discussed above, the undersigned recommends remand based on the lack of adequate explanation and substantial evidence to support the ALJ's rejection of the opined limitation to light work. Second, as discussed in Section IV.C., *infra*, the undersigned also recommends remand based on the ALJ's error in finding Mr. Cummings has (and can perform) past relevant work as a delivery driver. Absent past relevant work that requires commercial driving and was performed at light exertion, the adoption or non-adoption of a commercial driving restriction does not appear to be of material relevance to the disposition of this case. Nevertheless, to the extent a severe headache impairment is found on remand, the ALJ should consider whether any subjective reports of vertigo are consistent with that impairment.

For the reasons set forth above, the undersigned concludes that the ALJ lacked the support of substantial evidence and failed to build an accurate and logical bridge between the evidence and the result when she rejected the state agency consultants' opined limitation to light work and found Plaintiff able to perform medium work without explaining how the cited evidence supported the increase in Plaintiff's ability to lift and carry throughout the workday. Accordingly, the undersigned finds the first assignment of error is meritorious and recommends that the Court remand the matter for further proceedings consistent with this finding.

### B. Second Assignment of Error: The ALJ's Finding That Mr. Cummings Had Past Relevant Work as a Deliverer Lacked the Support of Substantial Evidence

In the second assignment of error, Mr. Cummings argues that the ALJ erred when she found at Step Four that his prior work as a delivery driver qualified as past relevant work. (ECF Doc. 7, pp. 13-15.) While he did perform the work within the relevant timeframe, he argues that

substantial evidence does not support a finding that the work was "substantial gainful activity." (*Id.* at p. 13.) Rather than contest the merits of this argument, the Commissioner argues "the Court need not resolve this specific argument" because the ALJ also found Mr. Cummings capable of performing other work at Step Five. (ECF Doc. 8, p. 8.) In his reply brief, Mr. Cummings notes that the Commissioner "appears to concede the error," but also acknowledges that the error was "likely harmless if the RFC [wa]s otherwise upheld." (ECF Doc. 9, p. 4.)

Consistent with Mr. Cummings's argument (ECF Doc. 7, p. 14), the record reflects that he reported working as a delivery driver for Hirzel Brothers Greenhouse from January 2019 through January 2022 (Tr. 293), but that his reported annual earnings from that employer were $0 in 2019, $6,402.50 in 2020, $1,333.75 in 2021, and $0 in 2022 (Tr. 253, 263-64). At his hearing, he testified that he had performed the job for "a few years" in the past five years and worked "[f]ull-time." (Tr. 42.) Without further inquiry, the ALJ found the job was "past relevant work." (Tr. 45.) In her decision, the ALJ found the job qualified as past relevant work and "was performed at the level of substantial gainful activity," citing the hearing transcript (Tr. 35-57), earnings report (Tr. 256-65), and work history report (Tr. 293) described above. (Tr. 27.)

Past relevant work (PRW) is defined as "work that an individual has done within the past 5 years, that was [substantial gainful activity ("SGA")],[] and that lasted long enough for the individual to learn to do it." SSR 24-2p, *How We Evaluate Past Relevant Work*, 89 Fed. Reg. 48479, 48480 (June 6, 2024). In evaluating whether work activity qualifies as "substantial gainful activity," the regulations provide that the "primary consideration will be the earnings [the individual] derive[s] from the work activity." 20 C.F.R. § 404.1574(a)(1). And if the person's "average monthly earnings are equal to or less than" the annual SGA level, those earnings are generally found to show the person "ha[s] not engaged in substantial gainful activity." 20 C.F.R.

§ 404.1574(b)(3)(i). The monthly earnings qualifying as SGA in the relevant years were: $1,220 in 2019; $1,260 in 2020; $1,310 in 2021; and $1,350 in 2022. *See* https://www.ssa.gov/oact/cola/sga.html (last visited Nov. 2, 2026).

In this case, the earnings records do not provide clear support for the ALJ's finding that Mr. Cummings's work as a delivery driver for Hirzel Brothers was substantial gainful activity. His reported earnings of $0 certainly did not rise to SGA levels in 2019 or 2022. (Tr. 252, 263.) And since he reported working the full year in 2020 and 2021 (Tr. 293), with no clarifying testimony suggesting he only worked certain months (Tr. 42-45), his annual reported earnings of $6,402.50 in 2020 and $1,333.75 in 2021 (Tr. 252, 263) average out to $533.54 per month in 2020 and $111.15 in 2021 respectively, well below the SGA levels of $1,260 and $1,310.

Considering the law and evidence discussed above and also considering the inadequate explanations of the ALJ (Tr. 27) and the Commissioner (ECF Doc. 8, pp. 8-9), the undersigned concludes that the ALJ failed to identify substantial evidence to support her finding at Step Four that Mr. Cummings had past relevant work (and was able to perform that work). This finding was not harmless considering the undersigned's additional conclusion in Section IV.B.2., *supra*, that the ALJ lacked substantial evidence to support her rejection of the state agency opinions limiting Mr. Cummings to light work and her adoption of a medium RFC.[4]

---

[4] The undersigned also observes that the apparently unsupported finding that Mr. Cummings performed light work at SGA levels between 2019 and 2022 may also raise concerns regarding other information the ALJ relied on in setting the RFC. For example, the ALJ's discussion of "the consistency of the claimant's allegations" included an observation that Mr. Cummings said he could return to work after his first motor vehicle accident in December 2020 (Tr. 24); but the significance of any such return to work may depend on the amount of work actually performed after December 2020. Similarly, the ALJ found it significant that reports of daily headaches began after the first accident, not after the second accident in 2022 (*id.*); but again, the significance of this inconsistency may depend on the amount of work Mr. Cummings actually performed between the two accidents. After making a new past relevant work finding on remand, the ALJ should consider whether the amount of work performed by Mr. Cummings following the 2020 motor vehicle accident impacts the "consistency" considerations identified in this footnote.

For the reasons set forth above, the undersigned concludes that the ALJ failed both to adequately explain and to identify substantial evidence to support her finding at Step Four that Mr. Cummings has past relevant work as a deliverer. Accordingly, the undersigned finds the second assignment of error is meritorious and recommends that the Court remand the matter for further proceedings consistent with this finding.

## V. Recommendation

For the reasons set forth above, the undersigned recommends that the final decision of the Commissioner be **VACATED** and **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation. On remand, the ALJ should clearly articulate the rationale supporting her residual functional capacity and past relevant work findings, ensure those findings are supported by substantial evidence, and ensure her stated rationale builds an accurate and logical bridge between the evidence and the result.

November 2, 2026

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).